**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| MILTON SCHULZ, Individually and on behalf of all others similarly situated, | ) | CASE NO. 3:19-cv-01620-N |
| Plaintiff, | ) | Judge David C. Godbey |
| v. | ) | |
| INFOGROUP INC., | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S PARTIAL MOTION TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ... 1

ISSUE PRESENTED ... 2

FACTS ... 2

ARGUMENT ... 5

I. STANDARD ... 5

A. Pleading Standard ... 5

II. THE TELEPHONE CONSUMER PROTECTION ACT ... 6

A. Calls Prohibited by the TCPA. ... 6

B. Heightened Requirements for Advertisements or Telemarketing Calls. ... 7

C. A Call Made with a Telemarketing Purpose—Regardless of Content—Is a Telemarketing Call ... 7

III. PLAINTIFF SUFFICIENTLY PLED DEFENDANT'S CALLS WERE MADE FOR A TELEMARKETING PURPOSE ... 10

A. The Plain Language of the TCPA and Case Law Directs that a Call Need Not be Answered in Order for the Call to Form the Basis of a TCPA Complaint. ... 11

B. Defendant's Mutually Beneficial "Express Update" Calls Are Telemarketing Calls and can Form the Basis of a TCPA Claim ... 11

C. The Hang-Up "Verification" Calls, as Described by Defendant, Qualify as Telemarketing Calls. ... 15

D. Defendant's Arguments to the Contrary Easily Distinguishable from the Instant Case and are Not Persuasive. ... 17

E. The Court Cannot Substitute Defendant's Facts for the Facts Pled in Plaintiff's Complaint ... 20

CONCLUSION ... 21

# TABLE OF AUTHORITIES

## Cases

*Aderhold v. Car2go N.A., LLC*,
No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014) ....................................... 20

*An Phan v. Agoda Co. Pte. Ltd.*,
351 F. Supp. 3d 1257, 1262 (N.D. Cal. 2018) ....................................................... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................... 6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................... 6

*Bennett v. GoDaddy.com LLC*,
No. CV-16-03908-PHX-ROS, 2019 WL 1552911 (D. Ariz. Apr. 8, 2019) ..................... 10, 16

*Chesbro v. Best Buy Stores, LP*,
705 F.3d 913 (9th Cir. 2012) ....................................................... 8

*Chinitz v. NRT West, Inc.*,
No. 18-CV-06100-NC, 2019 WL 720996 (N.D. Cal. Feb. 20, 2019) ....................................... 9

*Dolemba v. Illinois Farmers Ins. Co.*, No. 15 C 463, 2015 WL 4727331 (N.D. Ill. Aug. 10, 2015)
....................................................... 9

*Garteiser Honea, P.C. v. Moskowitz*,
No. 2:18-cv-00372-JRG, 2018 WL 6617780 (E.D. Tex. Dec. 18, 2018) ................................. 3

*Golan v. Veritas Entertainment, LLC*,
788 F.3d 814 (8th Cir. 2015). ....................................................... 8, 9, 16, 17

*Layden v. Adams Auto Corp.*,
No. 18-0065-CV-W-ODS, 2018 WL 2186628 (W.D. Mo. May 11, 2018) ............................... 9

*Mauthe v. Optum Inc.*,
925 F.3d 129 (3d Cir. 2019) ....................................................... 17, 18, 19

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2009). ....................................................... 7

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012)....................6

*Newhart v. Quicken Loans Inc.*,
No. 9:15-CV-81250, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016) ....................19

*O'Toole v. Northrop Grumman Corp.*,
499 F.3d 1218 (10th Cir. 2007) ....................3

*Payton v. Kale Realty, LLC*,
164 F. Supp. 3d 1050 (N.D. Ill. Feb. 22, 2016) ....................9

*Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*,
847 F.3d 92 (2nd Cir. 2017)....................8

*Shuckett v. DialAmerica Marketing Inc.*,
No. 17cv2073-LAB(KSC), 2019 WL 913174 (S.D. Cal. Feb. 22, 2019) ....................11

*Salmon v. CRST Expedited, Inc.*,
No. 14-CV-0265-CVE-TLW, 2015 WL 1395237 (N.D. Okla. Mar. 25, 2015) ....................19, 20

*Taylor v. Books A Million, Inc.*,
296 F.3d 376 (5th Cir. 2002). ....................6, 20

**Statutes**

47 U.S.C. § 227(a) ....................7

47 U.S.C. § 227(b)(1)(A)(iii)....................7, 11

**Regulations**

47 C.F.R. § 64.1200(f)(1) ....................7, 17

47 C.F.R. § 64.1200(f)(12). ....................12, 16, 21

**Other Sources**

*Data*, Infogroup.com, Internet Archive Wayback Machine (Jan 26, 2019), http://web.archive.org/web/20190126173427/http://infogroup. com/data....................2

Fed. R. Civ. P. 8(a)(2)....................5

Fed. R. Civ. P. 12(b)(6).....6

Infogroup.com, Internet Archive Wayback Machine (Apr. 25, 2019), http://web.archive.org/web/20190425023632/https://www.infogroup.com/.....2

John Akred and Anjali Samani, *Your Data is Worth More Than You Think*, MIT.edu (Jan. 18, 2019), https://sloanreview.mit.edu/article/your-data-is-worth-more-than-you-think/.....12

Report and Order, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278 (June 26, 2003).....2, 16, 10

*Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967, 25973 (May 3, 2006).....18

*The World's Most Valuable Resource is No Longer Oil, but Data*, The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.....12

*Who Called Us*, https://whocalled.us/lookup/8007941404 (last visited Feb. 5, 2020).....3, 13

# INTRODUCTION

This issue in this case is this: do Defendant's millions of autodialed, unsolicited phone calls—which solicit the recipient to engage in what Defendant describes as a "mutually beneficial" transaction—constitute "telemarketing" calls within the meaning of the TCPA? Here, Defendant effectively admits it engaged in a two-part scheme to collect and then verify a target's information so that it could repackage and sell the data. Such unsolicited phone calls, whose primary purpose is to create a transaction vis-à-vis obtaining data from the call recipient in ***exchange*** for unspecified future business, constitute "telemarketing" within the meaning of the TCPA. At a minimum, the calls evidence the exchange of a "good" in the form of the recipient's business data for Defendant's "service," an updated business listing provided by Defendant which Defendant claims results in greater exposure for the recipient's business.

Similarly, the secondary "verification" calls, which sought limited information again in exchange for a benefit to the recipient, were additional transactional calls in and of themselves. As such, the mere fact they resulted in a "hang-up" does not absolve Defendant of liability. The primary reason for this is that "telemarketing" under the TCPA is predicated upon the call's **purpose and context** instead of the call's **content.** It is for this reason that case law and guidance from the FCC direct that "hang-up" calls may constitute telemarketing where the purpose and context surrounding the call indicates the call was made for a telemarketing purpose. In fact, the Federal Communications Commission specifically identified "hang-up" and "dead air" calls as being: (1) a hallmark of the autodialed telemarketing call; and (2) especially harassing and

vexatious.[1] In short, because the "purpose" of Defendant's calls were a form of telemarketing, they violated the TCPA and Defendant's motion must fail.

## ISSUE PRESENTED

Did Plaintiff plead sufficient facts to support a finding that it is plausible that Defendant's calls were made for a telemarketing purpose?

## FACTS

Defendant, Infogroup, Inc. ("Defendant" or "Infogroup") advertises itself as a "big data, analytics and marketing services provider" that collects data from over 245 million individuals and over 25 million businesses. Plaintiff's First Amended Class Action Complaint for Damages and Injunctive Relief, Dkt. No. 19 ("Am. Compl.") ¶ 5. Infogroup then sells this bulk data to its clients to enable them to "reach the right consumer buyers," "increase sales," and "drive growth." Infogroup.com, Internet Archive Wayback Machine (Apr. 25, 2019), http://web.archive.org/web/20190425023632/https://www.infogroup.com/. Infogroup boasts that it verifies its data "at the rate of almost 100,000 phone calls per day . . . ." *Data*, Infogroup.com, Internet Archive Wayback Machine (Jan 26, 2019), http://web.archive.org/web/20190126173427/http://infogroup.com/data.

Plaintiff, Milton Schulz ("Schulz" or "Plaintiff"), is a private individual and the owner and operator of a small sole-proprietor chiropractic business located in Salina, Kansas. Am. Compl.

---

[1] *See* Report and Order, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278 (June 26, 2003) at 88–89 (emphasis supplied) ("The record shows that the use of predictive dialers has, in fact, become more prevalent in the telemarketing industry. The record also reveals that *predictive dialers are responsible for the vast majority of abandoned telemarketing calls—both hang-ups and "dead air" calls*. Individual consumers report receiving between three and ten hang-up calls each day. *Consumers often feel harassed or aggravated by "dead air" calls.* Many describe the burdens these calls impose on individuals with disabilities, who often struggle to answer the telephone. *Hang-ups and "dead air" calls can also be frightening for the elderly. Consumers complaint that they do not have an opportunity to request placement on a company's do-not-call list when predictive dialers disconnect calls.*").

¶ 4. Plaintiff uses his cellular telephone number as the telephone number for both his personal calls and his chiropractic business. *Id.* ¶ 7. On January 22, 2019; January 29, 2019; January 31, 2019; February 14, 2019; February 21, 2019; February 26, 2019; March 1, 2019; and March 5, 2019, Defendant initiated autodialed calls to Schulz's cellular telephone number using an ATDS, despite Schulz never consenting (in any form) to receive the calls. *Id.* ¶¶ 29, 31–32, 42. Schulz answered two of these calls on February 14, 2019 and February 21, 2019. *Id.* ¶ 43. Upon answering the call, the caller (Defendant) immediately disconnected or hung up. *Id.* To determine who was calling him, Schulz returned the phone call and was led directly to a pre-recorded message stating:

> You have reached Infogroup. Please visit www.expressupdate.com to claim and update your business listing so the information about your business is accurately displayed to users of online and mobile search devices. [new voice appears] You cannot leave a message for [another new voice appears] Express update.

*Id.* ¶ 34. This is essentially the same message Defendant concedes it supplies return callers in its Brief. *See* Def's Brf. at 6.

Shortly after discovering the caller's identity, Schulz began researching Defendant's business practices, ultimately uncovering that it contacts millions (literally) of individuals and businesses using its ATDS to obtain individuals' and businesses' current data in exchange for Defendant's service. *See* Am. Compl. ¶¶ 34–41. Public websites[2] confirm that Defendant calls businesses to ask them to verify their information as part of Defendant's "Express Update" service. *See Who Called Us*, https://whocalled.us/lookup/8007941404 (last visited Feb. 5, 2020) ("[I] Received a call from this number today. Without introducing who they were (which I see as a red

[2] The Court may take judicial notice of public websites. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); *Garteiser Honea, P.C. v. Moskowitz*, No. 2:18-cv-00372-JRG, 2018 WL 6617780, at *2 (E.D. Tex. Dec. 18, 2018) ("Here, the Court takes judicial notice of Defendant Blue Spike, Inc's website . . . .").

flag), they asked to confirm my business' correct name and address. After that I asked what this was about, they said they were calling from Express Update and were updating our contact information on their website."). In short, Defendant's initial call was made for a telemarketing purpose: namely, to solicit Schulz's business information in exchange for Defendant's business-listing service. Am. Compl. ¶¶ 35, 38

On February 21, 2019 Schulz sent a letter to Defendant demanding Defendant cease contacting him. *Id.* ¶ 44. Despite Schulz's demand, Defendant continued to call Schulz. *Id.* ¶ 45. On March 1, 2019 Schulz *again* contacted Defendant via e-mail requesting Defendant stop contacting him *and* informing Infogroup that its conduct violated the TCPA. *Id.* ¶ 46. Not only did Defendant *refuse* to honor Schulz's request it responded—incorrectly—that the TCPA "appl[ied] only to consumer data." *Id.* Ex. D at 1. After receiving Schulz's second request, Defendant informed Schulz via e-mail on March 1, 2019 that it had removed his information from its database and he would no longer receive calls. *Id.* Ex. D at 1. Defendant was wrong. Specifically, despite its representation that it had removed Schulz's information, Defendant continued to initiate unconsented autodialed calls to Schulz's cell phone. *Id.* ¶ 49.

On July 3, 2019 Plaintiff filed his initial Class Action Complaint and Jury Demand against Defendant; on November 26, 2019 Plaintiff filed his Amended Class Action Complaint and Jury Demand. *See* Dkt. 1, 19. On January 17, 2019 Defendant filed the instant Motion to Dismiss. *See* Dkt. 23. In its Brief Defendant does not dispute it utilizes an automatic telephone dialing ("ATDS") system to make calls, that it places calls to millions of other cellular telephone numbers using the same system, or that it placed calls to Plaintiff's cellular telephone number without first receiving Plaintiff's prior express consent. Defendant does not even dispute that its calls violated the TCPA

with respect to Plaintiff alone.[3] Defendant merely disputes that Plaintiff has sufficiently alleged that the phone calls made to Plaintiff were for "telemarketing" purposes. Def's Brf. at 7. That is the ***full extent*** of Defendant's motion.

Notably, Defendant's Brief adds some factual context for which Schulz can use to understand Defendant's telemarketing scheme. Specifically, Defendant explains that to participate in its "Express Update" service a business owner first needs to "confirm that his business contact information is correctly listed in Infogroup's database." Def's Brf. at 6. This correlates with the language heard by Schulz when he returned one of Defendant's calls. *See* Am. Compl. ¶ 34. Other calls, labeled by Defendant as "verification" calls, "verif[y] whether phone numbers are still in service" and are "programmed to immediately disconnect if someone answers." Def's Brf. at 3–4. This correlates with the immediate hang-up calls subsequently experienced by Schulz. *See* Am. Compl. ¶ 43. As argued below, each of these calls constitutes telemarketing because they solicited a transaction. Specifically, the calls sought to solicit the exchange Schulz's valuable business data for an updated business listing with Defendant.

## ARGUMENT

## I. STANDARD

### *A. Pleading Standard*

Federal Rule of Civil Procedure 8(a) directs that a complaint must contain, "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). A defendant may, in turn, move to dismiss any causes of action where the Plaintiff has

---

[3] While Plaintiff Milton Schulz did not provide Defendant with the express written consent to allow Defendant to initiate an autodialed telemarketing call, Schulz also did not provide Defendant with express consent to allow Defendant to initiate any kind of autodialed call to Schulz's cellular telephone number.

"fail[ed] to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). In 2007 and 2009 in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court set forth its interpretation of Fed. R. Civ. P. 8(a) as requiring a showing of "plausibility." Under the "plausible" pleading standard, complaints must contain "sufficient factual matter" which, if accepted as true, states a claim for relief which is "plausible on its face." *See Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. at 678. While this standard does not require "detailed factual allegations," the facts "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545. The court may accept reasonable inferences from the facts pled. *Iqbal*, 556 U.S. at 678. Furthermore, "[w]hen considering a motion to dismiss, the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). As such, courts must not give weight to facts supplied by a Defendant in its Motion to Dismiss.

## II. THE TELEPHONE CONSUMER PROTECTION ACT

### *A. Calls Prohibited by the TCPA.*

The Telephone Consumer Protection Act ("TCPA" or the "Act") was enacted in response to widespread public outrage concerning the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371–72 (2012). The Act prohibits "any person within the United States, or any person outside the United States if the recipient is within the United States" from "mak[ing] any call (other than a call made . . . with the prior express consent of the called party) . . . using any automatic telephone dialing system[4] - - (iii) to any

[4] "Automatic telephone dialing system" is defined within the Act as "equipment which has the capacity (1) to store or produce telephone numbers to be called, using a random or sequential

telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). In other words, the Act prohibits: (1) calls to cellular telephone numbers which are (2) initiated via an automatic telephone dialing system ("ATDS") without (3) first receiving the recipient's express consent. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2009).

### ***B. Heightened Requirements for Advertisements or Telemarketing Calls.***

The Federal Communications Commission adds an additional burden to ATDS calls which "include[] or introduce[] an advertisement or constitute[] telemarketing," requiring that callers using an ATDS first obtain the recipient's express ***written*** consent before sending an advertisement fax or initiating a telemarketing call. 47 U.S.C. § 227(b)(1)(A)(iii); *see in Rules and Regulations Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1844 (2012); 47 C.F.R. § 64.1200(f)(1)(12). The Code defines telemarketing as "encouraging the purchase or rental of, or investment in, property, goods, or services." *Id.* § 64.1200(f)(12). Where a phone call or text "serves a 'dual purpose'—that is, includes both telemarketing and merely informational or transactional communications—the messages are subject to the heightened express written consent requirements." *An Phan v. Agoda Co. Pte. Ltd.*, 351 F. Supp. 3d 1257, 1262 (N.D. Cal. 2018). Here, Defendant's calls clearly evidence a telemarketing "purpose."

### ***C. A Call Made with a Telemarketing Purpose—Regardless of Content—Is a Telemarketing Call.***

A communication made in violation of the TCPA need not present as a telemarketing attempt "on its face"—federal courts have found that where a communication is neutral, but the context shows that a telemarketing purpose exists behind the communication, the communication

number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a). Plaintiff sufficiently pled Defendant utilized an ATDS (*see* Am. Compl. Ex. F), Defendant appears to concede it utilizes an ATDS, and whether Defendant utilizes an ATDS is not at issue for purposes of the instant motion.

can form the basis of a TCPA claim. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 95 (2nd Cir. 2017) (finding that a fax offering a free dinner, which was neutral on its face, could form the basis of a TCPA claim and stating that "at the pleading stage . . . there is a plausible conclusion that the fax had the commercial purpose of promoting those products or services.").

For example, in *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015), the plaintiffs, recipients of unsolicited phone calls, brought a putative class action against a number of companies involved in initiating the call, which plaintiffs alleged was made for the purposes of promoting a movie. The prerecorded message simply stated: "Liberty. This is a public survey call. We may call back later." *Id.* at 816. Plaintiff alleged (after some preliminary discovery) that the message was part of a scheme to promote the movie "Last Ounce of Courage," comparing the initial script of the call (which was presumably obtained via preliminary discovery) to the content of the call received by plaintiffs. *Id.* at 818. Defendants moved to dismiss plaintiff's complaint on the grounds that the content of the call did not contain an advertisement, telemarketing message, or telephone solicitation. *Id.* The district court (erroneously) granted Defendants' motion. *Id.* In overturning the district court the Eighth Circuit declined to adopt the Defendants' argument that the content of a call is the only factor that should be considered when determining whether the call was made for a telemarketing purpose. *See id.* at 820. In deciding this the *Golan* court found that calls may be found to be telemarketing calls where the purpose of the call, ***which may be found from the context from which the call was placed***, was to "encourage[e] the purchase or rental of, or investment in, property, goods, or services . . . ." *Id.* Other courts have held exactly the same. *See Chesbro v. Best Buy Stores, LP*, 705 F.3d 913, 918 (9th Cir. 2012) ("Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is

clear from the context."); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1062–63 (N.D. Ill. Feb. 22, 2016) (Unlike the inquiry as to whether the call includes or introduces an advertisement, the 'telemarketing' inquiry focus[es] on the purpose of the call, rather than its content."); *Dolemba v. Illinois Farmers Ins. Co.*, No. 15 C 463, 2015 WL 4727331, at *4 (N.D. Ill. Aug. 10, 2015) ("The 'telemarketing' inquiry focuses on the purpose of the call, rather than its content . . . The TCPA does not 'require an explicit mention of a good, product or service,' where the implication of an improper purpose is 'clear from the context."); *Chinitz v. NRT West, Inc*., No. 18-CV-06100-NC, 2019 WL 720996, at *3 (N.D. Cal. Feb. 20, 2019) ("NRT argues that the Court should limit its purpose-of-the-call analysis to the call itself. The Court disagrees. In its implementing regulations, the FCC clarified that the TCPA reached prerecorded messages that . . . introduce[] an advertisement or constitute[] telemarketing . . . This language makes clear that the TCPA reaches prerecorded messages that do not constitute advertisements or telemarketing themselves."); *Layden v. Adams Auto Corp.*, No. 18-0065-CV-W-ODS, 2018 WL 2186628, at * 2 (W.D. Mo. May 11, 2018) ("While dual purpose calls may inquire about a customer's satisfaction with a purchased product or service, these calls are 'motivated in part by the desire to ultimately sell additional goods or services.' [] 'If the call is intended to offer property, goods, or services for sale either during the call, or int eh future . . ., that call is an advertisement.'"). Importantly, the Court in *Golan* further noted that "[e]ven when the intended content of a message is not conveyed, the intrusion into the home and the 'seizure' of the phone line is the same." *Golan* at 818. Meaning: the mere fact the plaintiff did not receive the call, or the call resulted in a hang-up, is irrelevant *if* the call's purpose—as can be determined by the ***context*** of the call—was telemarketing.

## III. PLAINTIFF SUFFICIENTLY PLED DEFENDANT'S CALLS WERE MADE FOR A TELEMARKETING PURPOSE

At issue here is whether Schulz pled sufficient facts that contextually establish Defendant's calls were made for a **telemarketing purpose**. The mere fact the call went unanswered—or was intended to trigger a hang-up—is irrelevant. As Defendant itself concedes, "[a]n unanswered call could theoretically constitute telemarketing, so long as the caller had a telemarketing 'purpose' when it placed the call." Def's Brf. at 11 (citing *Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911 (D. Ariz. Apr. 8, 2019)). Such is the case here.

Substantial sources support the finding by the United States Court for the District of Arizona in *Bennett v. GoDaddy.com LLC*. Guidance issued by the FCC as well as other federal courts direct that: (1) hang-up and dead air calls are equally vexatious to the United States public for the purposes of the TCPA;[5] (2) hang-up and dead air calls are often the result of telemarketing via ATDS;[6] and (3) intentional hang-up calls—such as Defendant's self-described "verification" calls—can have their own telemarketing purpose absent any content.[7] As discussed below, Plaintiff's Amended Complaint plausibly pleads that Defendant's calls qualify as telemarketing.

---

[5] *See* Report and Order, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278 (June 26, 2003) at 9 n.32 ("Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (i.e., the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not available when the consumer answers the phone, resulting in 'dead air' or a hang-up.").

[6] *See id.*

[7] *See Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *9 (D. Ariz. Apr. 8, 2019) ("[I]f an entity initiates a call with the undisputed purpose of selling a product, the call is picked up, but the recipient prevents the call from involving discussions regarding the purchase of the product (such as by hanging up immediately), the entity still has violated the TCPA.").

Thus, the Court should err in favor of allowing Plaintiff the opportunity to conduct discovery to support his plausible allegations that Defendant's calls were made for a telemarketing purpose.

### ***A. The Plain Language of the TCPA and Case Law Directs that a Call Need Not be Answered in Order for the Call to Form the Basis of a TCPA Complaint.***

First, it is well accepted that a recipient ***need not answer a call*** for the court to consider the intended context or purpose of the call. *See Shuckett v. DialAmerica Marketing Inc.*, No. 17cv2073-LAB(KSC), 2019 WL 913174 (S.D. Cal. Feb. 22, 2019). For example, in *Shuckett v. DialAmerica Marketing, Inc*., the Defendant alleged that Plaintiff's claims premised on alleged unlawful telemarketing calls in violation of the TCPA warranted dismissal because Plaintiff had not answered the phone calls, and thus did not sustain an injury sufficient to confer standing. *See id.* at *1. In denying Defendant's Motion to Dismiss the court in *Shuckett* found that "[t]here is no meaningful difference between an unanswered phone call and a text message. Neither requires an outlay of time or energy, but both 'disturb the solitude of their recipients.'" *Id.* at *2 (citing *Van Patten v. Vertical Fitness Grp*., LLC, 847 F.3d 1037, 1043 (9th Cir. 2017)). The court concluded that "[t]he invasion of privacy caused by unwanted telemarketing calls is not diminished simply because a plaintiff chooses to decline the call." *Id.* In short, whether a plaintiff answers or doesn't answer an offending TCPA call is of no moment for a TCPA suit so long as the Plaintiff is able to allege the context or purpose of the call was for telemarketing. This is because a violation of the TCPA is premised on the *initiation* of an unconsented ATDS call—not the Plaintiff's successful answering of the actual robocall. *See* 47 U.S.C. § 227(b)(1)(A)(iii).

### ***B. Defendant's Mutually Beneficial "Express Update" Calls Are Telemarketing Calls and can Form the Basis of a TCPA Claim.***

Defendant argues in its brief that "the purpose Schulz alleges—to collect and confirm his business contact information—does not constitute telemarketing." Def's Brf. at 2. Such an

argument expressly contradicts the plain text of the C.F.R. as well as case law. For example, The C.F.R. defines telemarketing as a communication which "encourage[es] the purchase or rental of, or investment in, property, goods, or **services**." 47 C.F.R. § 64.1200(f)(12) (emphasis added). In initiating information-gathering "Express Update" calls to its recipients, Defendant intended to induce the recipient to enter into a transaction whereby the recipient would give Defendant something of value held by the recipient (its valuable data) for something of value offered by Defendant (an updated online listing). The exchange is evident from the prerecorded message heard by Schulz when he returned Defendant's call:

> You have reached Infogroup. Please visit www.expressupdate.com to claim and update your business listing so the information about your business is accurately displayed to users of online and mobile search devices. [new voice appears] You cannot leave a message for [another new voice appears] Express update.

Am. Compl. ¶ 34.

Importantly, Defendant itself confirms that the data it solicited from Schulz was valuable,[8] and that the service provided to Plaintiff in exchange for the data was likewise valuable. Def's Brf. at 6. As described by Defendant itself this transaction is intended to be a "mutually beneficial" exchange. *Id.* at 6. Defendant's argument underscores its view that **<u>this exchange of data for services is a transaction in its most basic form.</u>** The fact that Defendant sought to effectuate this transaction over the phone means that the exchange qualifies as telemarketing for the purposes of the C.F.R. and the TCPA.

---

[8] Economists and scholars agree that **<u>data</u>** is now the most valuable "commodity" on Earth. *See The World's Most Valuable Resource is No Longer Oil, but Data*, The Economist (May 6, 2017), available at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data; John Akred and Anjali Samani, *Your Data is Worth More Than You Think*, MIT.edu (Jan. 18, 2019), https://sloanreview.mit.edu/article/your-data-is-worth-more-than-you-think/.

But the Court need not rely upon the message alone to determine the purpose of the call—Defendant's website and other online sources establish Defendant routinely initiates calls to businesses for the purpose of asking them to exchange their business information for an updated listing which will help customers to find him. Specifically, Defendant advertises its business online as "allow[ing] you to put the power of Infogroup's data expertise behind your business listing . . . **When you update your business listing with Express Update, you make it easier for millions of consumers to find you**." *See* Am. Compl. ¶ 37 (evidencing the exchange between Defendant and business owners) (citing *Why Use Express Update?*, Expressupdate, https://www.expressupdate.com/why_express_update (last visited May 12, 2019) (emphasis added)).

Online sources for which this Court can take judicial notice (*see supra* n.2), also confirm that Infogroup routinely calls businesses to update their information in exchange for an "updated business listing." *See Who Called Us*, https://whocalled.us/lookup/8007941404 (last visited Feb. 5, 2020). Recipients describe the calls received from Defendant as follows:

- "Received a call from this number today. Without introducing who they were (which I see as a red flag), they asked to confirm my business' correct name and address. After that I asked what this was about, they said they were calling from Express Update and were updating our contact information on their website." *Id.*

- "Caller ID said "Express Update" When I answered the phone with my non-profit company name, they hung up immediately[.]" *Id.*

- "[R]obo caller scum. I demanded [do not call] they said I had to submit that request in writing . . my number is already on federal DNC, their website claims they screen against that . . THEY DO NOT. I spoke to several people at the opt out line, and the corporate HQ . . no one would comply with the law . . Reported, but it's going to take a lot more to make the FTC take action . ." *Id.*

- "[The caller said] [p]lease update your business information for better results . . . And how will they do this for me? How did you find me? Leave me alone." *Id.*

- "Received call from a woman without ever verifying who she was or what Company she was calling from . . . she asked is this your address and phone number? At which point something didn't feel right so I asked her who she was and why she was calling . . . She was like "uh-wha-uh- expressupdate.com" Click She hung up." *Id.*

- "This is a for profit company that sells business information and leads so you will get an avalanche of sales calls if you give them info." *Id.*

Furthermore, statements made by the company who sold Defendant its ATDS system indicates that "[Defendant's] call centers handle 23 million outbound calls per year for B2B verification on business records . . . We are achieving 65-100 calls per hour per agent between live contacts and screened calls, allowing us to update more records, more quickly." *See* Am. Compl. Ex. F at 1. Most importantly, Defendant confirms the same in its Brief accompanying its First Motion to Dismiss:

> Express Update is an Infogroup service that is free to business [sic] like Schulz's. To "claim and update your business listing," a business owner like Schulz would simply confirm that his business contact information is correctly listed in Infogroup's database. **Express Update is mutually beneficial — it allows patrons to find businesses, and it increases the accuracy (and thus the value) of Infogroup's data.**

Def's Brf. at 6 (emphasis added). In short, Defendant's ***own brief*** concedes it is engaged in activity expressly for the purposes of "exchanging goods . . . and services" (i.e. the recipient's business information and data for Defendant's update and business listing service).

Based on this information from several different sources—including Defendant itself—Schulz pled in his Amended Complaint that the calls he received from Defendant were initiated for advertisement or telemarketing purposes, stating:

> 35. **Defendant's unsolicited call to Plaintiff sought to encourage him to provide or update contact information related to his chiropractic business so Defendant could include it within one or more database(s) Defendant may sell to its subscribers**. . . .
>
> 36. Defendant uses its autodialed calls to Plaintiff and class members in order to encourage and include the use of its "Express Update" Services . . . .

> 38. Defendant's autodialed calls were a pretext to obtain recipients' participation in Defendant's proprietary database . . . .

*Id.* ¶¶ 35–36, 38 (emphasis added). Put another way, Plaintiff's Amended Complaint, along with other contextual facts which this Court may consider in connection with this motion, provide sufficient facts to establish the purpose of Defendant's call was related marketing Defendant's "Express Update" services.

The exchange that is proposed by Defendant's "Express Update" calls is nothing more telemarketing in its most basic form—a request for an exchange of an items of value. "Express Update" calls offer a service to the recipient by updating the recipient's business contact information, and in turn the recipient gives Infogroup the recipient's valuable information. The Court need not take Plaintiff's word for it—Defendant itself agrees that the exchange provides something of value to each party, stating "Express Update is mutually beneficial—it allows patrons to find businesses, and it increases the accuracy (and thus the value) of Infogroup's data." Def's Brf. at 6. As such, Plaintiff has sufficiently pled that the calls at issue were made for the purposes of telemarketing in violation of the TCPA.

### *C. The Hang-Up "Verification" Calls, as Described by Defendant, Qualify as Telemarketing Calls.*

Defendant's hang-up "verification" calls are likewise telemarketing in the same way that its "Express Update" calls constitute telemarketing—they solicit a "mutually beneficial" transaction. As stated in Defendant's Memorandum of Law in Support of its Motion to Dismiss, Defendant's "verification" calls immediately disconnect when they confirm that the targeted phone number is still in service. *See* Def's Brf. at 11 n.4. Just as it did with its "Express Update" calls, Defendant contends its hang-up "verification" calls do not qualify as "telemarketing" on the grounds that they lack "content." Def's Brf. at 11–12. Defendant's argument is wrong for all the

reasons set forth above. Again, "content" alone is far from sole determiner in a telemarketing inquiry; a plaintiff may rely on the context surrounding a phone call to provide the facts necessary to plead that a phone call was made for telemarketing purposes. *See Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015). As pled by Plaintiff—and confirmed by Defendant in its Brief—Defendant's hang-up "verification" calls to Plaintiff were a soliciting the **exchange of Plaintiff's valuable information for Defendant's services** and thus fall squarely within the definition of telemarketing set forth in 47 C.F.R. § 64.1200(f)(12). *See id.* (defining telemarketing as "encouraging the purchase or rental of, or investment in, property, goods, or services.").[9]

Second, as recognized by the Federal Communications Commission ("FCC") in its July 3, 2003 Report and Order, companies who have become more sophisticated in an effort to evade the TCPA should not enjoy the benefits of their chicanery. *See* Report and Order, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278 (June 26, 2003). The FCC, in clarifying and expanding its rules related to the TCPA, recognized that "marketplace changes warrant modifications" in part due to "**hang-up** and '**dead air**' calls" to ensure that consumers "continue to receive the protections that Congress intended to provide when it enacted the TCPA." *Id.* Here Defendant targets potential data sources, including Plaintiff, using a sophisticated "hang-up" call for the purposes of engaging in a transaction (the

[9] Furthermore, Plaintiff argues that if the Court finds that Defendant's hang-up "verification" calls are not telemarketing calls on their own, the "verification" calls are an integral part of Defendant's telemarketing scheme which begins with first obtaining a target's information via Defendant's "Express Update" calls, and then continuing to verify the information with Defendant's "verification" calls. Courts have held that a telemarketing purpose may be found from analyzing the telemarketing scheme as a whole. *See Bennett v. Godaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 WL 1552911, at *9 (D. Ariz. Apr. 8, 2019) (noting that the purpose of a telemarketing campaign as a whole can be considered unless a defendant produces evidence that certain calls were made for other purposes).

exchange of the target's data for an updated business listing). The Court ought not to allow Defendant's novel methods to evade the reach of the statute that was intended to prohibit such vexatious and bothersome calls.

### *D. Defendant's Arguments to the Contrary Easily Distinguishable from the Instant Case and are Not Persuasive.*

In response, Defendant turns to *Mauthe v. Optum Inc*., 925 F.3d 129, 131 (3d Cir. 2019) hoping to evade liability. *Mauthe*, however, provides little comfort for Defendant given it is easily distinguished from this case. Specifically, in *Mauthe* the plaintiff, a healthcare provider, received an unsolicited fax from defendant asking the plaintiff to verify information. *Id.* at 131. The purpose of the request was to allow the defendant to ensure its information was accurate so it could "market, sell, and license the database . . . ." *Id.* The court in *Mauthe* ultimately held that the fax was not an attempt to sell anything to the plaintiff, and thus did not require express written consent. *See id.* at 133. Notably, however, the communication at issue in *Mauthe* was ***not*** a telephone call, but a fax. *See id.* at 132–33. This presents an entirely different inquiry than the one at issue here, since the central inquiry with regard to fax solicitations is whether the **content of the fax** constitutes an **advertisement**, and the century inquiry with regard to telephone calls is whether the **purpose of the call** was for telemarketing. *See Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("While the content of the calls control[s] whether they [are] 'advertisements,' their purpose control[s] whether they [are] 'telemarketing.'"); 47 C.F.R. § 64.1200(f)(1) (defining advertisements as "material advertising the commercial availability or quality of any property, goods, or services."); *Id.* § 64.1200(f)(12) (defining telemarketing as "encouraging the purchase or rental of, or investment in, property, goods, or services."). The inquiries are simply not comparable.

Importantly, the plaintiff in *Mauthe* did not claim (as Plaintiff Schulz does) that the exchange of information from plaintiff to defendant constituted a transaction, nor did the plaintiff in *Mauthe* claim (as Plaintiff Schulz does) to be a potential direct purchaser of defendant's product. In fact, the plaintiff in Mauthe did not even seek to impose liability on the company that called the plaintiff (as Plaintiff Schulz does), but sought to impose liability on the defendant based on a third-party liability theory. *Id.* at 133. In finding for defendant under the specific facts set forth in *Mauthe* (which are entirely different than the facts pled by Plaintiff Schulz in the instant case), the court found that there was no nexus between the communication and the "purchasing decisions of an ultimate purchaser." *Id.* at 133. Again, here Schulz alleges that he was the ultimate purchaser who had the ability to chose to participate, or not participate, in Defendant's proposed transaction.

It's also important to note that the court in *Mauthe* expressed concern that adopting a stricter standard would negatively affect research companies, market survey companies, political polling or similar activities which do not "involve solicitation," who presumably would not "advertis[e] the commercial availability or quality of property, goods, or services" so as to run afoul of the FCC. *Id.* at 134; *see Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967, 25973 (May 3, 2006). This is of no concern here. The instant case is distinguishable from the unintended consequences articulated in *Mauthe* for two reasons. First, while research firms may solicit information from individuals which they later sell, **they do solicit a transaction or exchange.** In other words, the research firm does not offer the individual anything in return for his or her information (as is the case here). *See* Def's Brf. at 6 (describing the exchange as a "mutually beneficial" transaction). Second, the plaintiff in *Mauthe* did not allege defendant solicited him to engage in a transaction, nor did

plaintiff allege that defendant's request for information sought to sell him defendant's services (as is the case here).

As such, Defendant's reliance on *Mauthe* is misplaced. No result finding that Defendant's solicitation offering Plaintiff a "mutually beneficial" exchange of Plaintiff's business information in return for an updated business listing would result in the unintended consequences the *Mauthe* court sought to avoid. With respect to the calls at issue, Plaintiff has sufficiently pled that Defendant's offending calls qualify as "telemarketing" calls and were placed to Plaintiff in violation of the TCPA.

Next, Defendant's argument which relies upon a series of cases to contend "context is not a substitute for content" is equally unconvincing. First, Defendant cites *Newhart v. Quicken Loans Inc.*, No. 9:15-CV-81250, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016), for the proposition that courts must examine individual calls and not the "overall campaign" when deciding whether telemarketing consent rules apply. Def's Brf. at 10. *Newhart* did not involve the threshold issue here (i.e. whether a plaintiff sufficiently pled that an unsolicited "hang up" or "dead air" call was made for a telemarketing purpose). Instead, *Newhart* involved a Rule 23 motion where the Court decline to certify the class because some members ostensibly consented to the call. *See Newhart* at *1, 3. In short, the case provides no guidance on what does or does not constitute telemarking.

Similarly, the remaining cases cited by Defendant are likewise inapplicable. For example, Defendant cites *Salmon v. CRST Expedited, Inc.,* No. 14-CV-0265-CVE-TLW, 2015 WL 1395237 (N.D. Okla. Mar. 25, 2015), a case brought by a *pro se* plaintiff, for the proposition that a telemarketing purpose cannot be gleaned from "outside information," however, the outside information provided by the *pro se* plaintiff in *Salmon* was his **unsubstantiated personal beliefs**. Plaintiff's "outside information" here is based on (1) the message received by Plaintiff when he

returned Defendant's call; (2) Defendant's own website describing its services; (3) other websites discussing Defendant's calls. This is far from the unsubstantiated musings of the plaintiff in *Salmon*. As such, Defendant's citation of the case for the proposition claimed by Defendant is wholly misleading and inapplicable. Lastly, Defendant receives a third and final strike with its citation of *Aderhold v. Car2go N.A., LLC,* No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014) for the proposition that the "informational content" of a text could be weighed against a telemarketing context at the motion to dismiss stage. In *Aderhold* the plaintiff again presented the court with nothing more than his unsubstantiated personal beliefs and bald claims that the text he received asking him to enter an activation code was telemarketing. *Id.* at *9. The plaintiff in *Aderhold* presented no context for which the court could find that the text had a telemarketing purpose, and thus the court weighed nothing, but found that based solely on the plain language of the text that the message was not a telemarketing message. *Id. Aderhold*'s facts are not the facts presented here—Schulz has provided substantial contextual information supporting his allegations that the "hang-up" call at issue was made for a telemarketing purpose. As such, the Court ought to ignore these misleading and inapplicable citations which run counter to the numerous published cases cited by Plaintiff.

### *E. The Court Cannot Substitute Defendant's Facts for the Facts Pled in Plaintiff's Complaint.*

"When considering a motion to dismiss, the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Taylor v. Books A Million, Inc*., 296 F.3d 376, 378 (5th Cir. 2002). Despite this well-established case law, Defendant repeatedly attempts to substitute its own facts for the facts which were alleged (and supported) by Plaintiff in his Amended Complaint. As such, Defendant doesn't ask the Court to dismiss Plaintiff's suit for Plaintiff's failure to plead his claim to a "plausibility" threshold—

Defendant asks the Court to entirely ignore Plaintiff's Amended Complaint and impermissibly engage in fact-finding unilaterally in Defendant's favor. Such a request is entirely improper at this stage and without any basis in law. Plaintiff has pled above Rule 8(a)'s requirements and has provided factual enhancement creating a plausible claim that the phone calls placed to Plaintiff by Defendant were made for telemarketing purposes. Thus, there is no other outcome but to deny the instant motion.

## CONCLUSION

The instant motion turns on whether Plaintiff pled facts sufficient to state a plausible claim that Defendant's calls were made for a telemarketing purpose. Here Plaintiff pled that the calls at issue were placed by Defendant to effectuate a mutually beneficial exchange—specifically, the exchange of one item of value (Plaintiff's information) for another item of value (Defendant's service updating Plaintiff's business listing). This is a basic exchange of a good for a service and is squarely within the C.F.R.'s definition of telemarketing; simply put, the calls were placed with the purpose of "encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).

Plaintiff's causes of action against Defendant for violation of the TCPA, and the facts supporting them, are not the products of speculation but the result of diligent investigation on the part of Plaintiff. Plaintiff has pled sufficient facts to show that it is plausible the purpose of Defendant's call was to encourage a transaction whereby Plaintiff would exchange valuable data for a valuable updated business listing with Defendant. Plaintiff's telemarketing claims should not be dismissed at this early stage before either party has had the opportunity to conduct discovery. For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendant's Motion to Dismiss.

Dated: February 21, 2020

Respectfully submitted,

*Jennell K. Shannon*
Timothy J. Becker (MN Bar. No. 256663)
Jennell K. Shannon (MN Bar No. 0398672)
**JOHNSON BECKER, PLLC**
444 Cedar Street, Suite 1800
Saint Paul, Minnesota
Telephone: (612) 436-1800
Fax: (612) 436-1801
tbecker@johnsonbecker.com
jshannon@johnsonbecker.com

**CLARK & McCREA**
**COLLEN A. CLARK**
State Bar No. 04309100
**JACOB L. von PLONSKI**
State Bar No. 24098554
3500 Maple Avenue, Suite 1250
Dallas, Texas 75219
214-780-0500
214-780-0501 Fax
cclark@clarkmccrea.com
eservice@clarkmccrea.com
jake@clarkmccrea.com

Jason J. Thompson
**SOMMERS SCHWARTZ, P.C.**
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: 800/783-0989
Email: jthompson@sommerspc.com

Phillip A. Bock
Tod A. Lewis
**BOCK, HATCH, LEWIS & OPPENHEIM, LLC**
134 N. La Salle Street, Suite 1000
Chicago, IL 60602
Telephone: 312/658-5500

*Counsel for Plaintiff and the Proposed Class*